# Staunton

## EFFIE NELMS BUTLER v. NOLDE BROTHERS, INCORPORATED, ET AL.

September 7, 1949.

Record No. 3539.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Thomas L. Woodward* and *M. Anderson Maxey*, for the appellant.

*Rixey & Rixey* for the appellees.

STAPLES, J., delivered the opinion of the court.

This is an appeal from a final order of the Industrial Commission denying a claim for compensation instituted by

Effie N. Butler, the widow of Roland P. Butler, who died as a result of injuries received in an automobile accident. A clear statement of the case appears from the following findings of fact taken from the opinion of Commissioner Martin, before whom the hearing was conducted:

"On Thursday, November 13, 1947, at approximately 6:30 P. M. Roland P. Butler was severely injured in an automobile accident. He died about an hour later. The employer's report of the accident says that 'deceased was driving his (own) automobile along Highway No. 460 going west, and collided with the rear of a large truck ahead which was also headed west.' The collision occurred about four miles west of Windsor between that town and Zuni. The town of Ivor is on the same highway some five miles west of Zuni. The distance between Ivor and Windsor is eleven miles.

"The sole claimant is the surviving widow, Mrs. Effie Nelms Butler. The average weekly wage was sufficient to yield the maximum rate of compensation.

"The defences interposed are (1) that the accident did not arise out of and in the course of the employment; (2) that claimant had voluntarily deserted or abandoned deceased at the time of the accident and thus not conclusively presumed to be a dependent under Section 40 of the Act; and (3) that deceased was guilty of wilful misconduct as defined by Section 14 of the Act in that he was violating a rule of his employer at the time of the accident.

"The accident, of course, is admitted, the most troublesome question being whether it arose out of and in the course of the employment. On this point, aside from some undisputed facts, the evidence consists almost entirely of uncorroborated hearsay, much of it quite confusing and somewhat inconsistent.

"Deceased was, and had been for something over three years, a route salesman for his employer—a manufacturer of bread, cakes and other bakery products. His duties were to sell and deliver (and collect therefor) his employer's products to restaurants and retail grocery stores located on a fixed

route which included, among others, the towns of Windsor, Dendron, Smithfield, Zuni and Ivor. To perform these duties his employer furnished him a truck and paid for the cost of its operation. The compensation of deceased was a salary of $35.00 a week plus a commission of ten per cent on sales in excess of $350.00 a week. It was the practice of deceased to leave the truck at the completion of each day's work at a filling station in Windsor operated by Frank L. Brown. Each morning about four o'clock the truck would be supplied by employer's supply truck from Norfolk with products for sale that day. Deceased would then start out on his route and normally would complete his day's work between three and five o'clock in the afternoon. Deceased had been instructed by his employer that he was not to use his personal automobile in his business, the truck being furnished him for that purpose. As has been stated, however, when the accident occurred deceased was driving his own car. He had only owned a car for about eight months.

"The above facts are undisputed.

"The theory of claimant is that at the time of the accident deceased was on his way to Zuni and Ivor for the purpose of supplying his customer's needs or collecting from them for products previously delivered or for both purposes. The evidence bearing on this theory will now be considered.

"Claimant testified that she operated a store two miles from Windsor on the Smithfield Highway (No. 258), and that although they had not been living together for several months she was a customer of deceased and saw him frequently; that he had supplied her with bread at two o'clock in the afternoon of November 13th, at which time he was driving the truck, and that he had returned about six o'clock, driving his own car, for the purpose of discussing a plan to meet her in Norfolk the next day at four to see a physician; that on the second visit he mentioned that he was going to Windsor, and then to Ivor to 'service' Goodman Horne and to collect from him—again he mentioned

that he was going to collect at Zuni—and again that he was going to try at these points to 'work off' some cakes that he had on hand; that he wanted to make a deposit in bank the next day as he had not made his deposit on Monday; that he had owned a car for only eight months and had frequently used this car in his work; that when deceased was killed he had his money pouch on him containing about $120.00; that deceased lived with his uncle a mile and a half from Windsor on Route 258. Reluctantly it must be said that claimant's demeanor on the stand was not impressive.

"Claimant's witness, John W. Warren, operates a filling station and restaurant at Kinser's Kabin, two miles east of Windsor on Route 460. He stated that 'around six or seven o'clock' in the afternoon on November 13th deceased came to his place to deliver bread; that he was there for about half an hour (getting his supper there as he frequently did) and that he overheard him say to his (Warren's) wife that he was going to 'deliver some bread'; that deceased generally delivered bread to Warren from his truck around four o'clock but sometimes as late as six or seven; that he did not know whether deceased was driving the truck or his car on this particular occasion.

"Mrs. John W. Warren testified to the same general effect as her husband except that deceased told her (the remark that Mr. Warren overheard) that he had to go to Zuni to deliver some bread.

"Relative to the testimony of Mr. and Mrs. Warren the comment is made that when the accident occurred, deceased then not having reached Zuni or Ivor, there was no bread in his car. Nothing was said to these two about collecting or about cakes.

"Claimant introduced Frank L. Brown, proprietor of the filling station in Windsor where deceased stored his truck. He testified that deceased drove in with the truck a little after six in the afternoon of November 13th and instructed that it be filled with gas; that deceased parked the truck at Brown's place each afternoon, his personal car being kept there during the day; that on this occasion deceased trans-

ferred 'something' from the truck to the car and drove on off saying he had to run up to Ivor; that each day deceased would drive in with his truck, park it, get in his own car and depart.

"The sequence of the evening stops at claimant's store, the Warren's place (Kinser Kabin) and Brown's filling station at Windsor is difficult to determine from the testimony (they all fix the time at 'about six' or a 'little after six'), but it is not believed to be material. It is more probable, however, that after leaving Kinser's Kabin deceased went to Brown's place, left his truck there, got in his personal car, visited his wife at her store, and then started out for Ivor.

"Earl Kello stated that he operated a 'wrecker', and on the day of the accident he brought in the car of the deceased; that he noticed four or five boxes in the back of the car and that he put them in his car and delivered them to 'some of the Nolde men the next day'; that Trooper Anderson reached the scene of the accident before he did.

"Ray Rainey, a witness for defendant, said that he operated a store at Zuni and was a customer of deceased; that his bread and cakes were always delivered in the morning before he got to the store; that nothing was ever delivered in the afternoon; that deceased always made his collections on Monday afternoon.

"Roland Nelms, a stepson of claimant, said that he went to the scene of the accident and saw some boxes in the back of the car and that deceased had his money pouch on him. The other facts to which he testified he admitted came to him by 'word of mouth'.

"Defendants introduced Geo. F. Nolde, Manager of the employer's Norfolk branch, who had general supervision over deceased. He stated that deceased had been employed about four years; that their men were not permitted to deliver bread and cakes nor to make collections in their own cars and that deceased had been so instructed by him when he was employed; that the trucks were furnished them for this purpose and they were to be so used; that the expense of their operation was borne by the employer; that he did

not know that deceased ever used his own car in his work; that deceased had only had his own car for eight months; that while deceased did not have any definite hours of work he was supposed to get his work done as early as possible, and that 'roughly' his hours were from four or five o'clock in the morning until three to five o'clock in the afternoon; that one package of cakes was brought to him from Kello's garage the day after the accident.

"Emerson Presson drove the employer's truck that supplied the truck operated by deceased with bakery products each night at Windsor. After the death of the deceased he took over his route. Presson testified that as route salesman he started out 'around 4:30' in the morning (as did deceased) and if he was not 'held up' he finished by two in the afternoon; that he had no duties after that time; that he always made his collections on Monday afternoons—never on Thursdays or on any other day; that he never got any calls for extra deliveries and did not make any; that he knew he was supposed to use the truck in his business but had no recollection of any instructions not to use his own car; that he did not own a car; that he did not know that deceased ever used his own car for businsess purposes; that he got the cakes from Kello's garage and delivered them to Mr. Nolde; that if he had any products left over at the end of the day they remained on the truck until the next morning.

"State Trooper E. R. Anderson, reached the scene of the accident at approximately 7:00 P. M. before the arrival of Roland Nelms. He said that the accident occurred about thirty minutes before that time; that he looked into the car of deceased and was positive that there were no packages of bread or cakes in the back or front; that the money pouch of the deceased was at the scene of the accident.

"At the conclusion of the hearing counsel for claimant made the following statement:

" 'I would like to get Mr. Manning, he would testify at the time he ran a grocery store at Zuni and he was expecting Mr. Butler to deliver him bread that day. M. T. Mann-

ing, here is his return served on his wife. I have talked to him and he will tell that, I understand.'

"Since this witness had been previously summoned on behalf of claimant, the request was granted over the objection of counsel for defendants. However, counsel for claimant advised a few days later that he had decided to take no further testimony.

"Subsequently, after reading a transcript of the testimony, it was apparent to the Hearing Commissioner that Manning and Goodman Horne, customers of deceased at Zuni and Ivor respectively, were, or could be, material witnesses, and desiring to have the benefit of all procurable facts, he requested counsel to take their testimony. Counsel for claimant agreed to this. However, the testimony of neither of these witnesses was taken, although a transcript of that of Mrs. Goodman Horne was supplied, as well as that of Hudson Griffin, an employee of the Hornes, and of Earl Forehand, for the defendants, and of a Mrs. W. L. Pearce for claimant.

"Claimant's witness, M. T. Manning, a customer at Zuni, was not called upon to testify. Indeed at the time of taking depositions on July 20th counsel for claimant announced that he would not be called. No explanation of this has been furnished. The obvious inference is that his testimony would not have been favorable to claimant.

"Mrs. Horne testified that she and her husband operated a service station (and presumably a store or restaurant) at Ivor and were customers of deceased during the entire time he worked for the employer; that their supplies were delivered by deceased from his truck early in the morning; that he had no regular day for collecting and never collected in the afternoon but always late in the evening or at night— ten o'clock some nights, and that he always drove his own automobile on these occasions; that she owed him some money at the time of his death; that she never put in an additional order for bread or cakes (and did not on the day of the accident) but he always brought some with him when he came to collect at night and would supply her if

she was 'short'; that deceased was 'a friend of ours, we had known him all our lives', and frequently would bring Mrs. Butler with him on these trips and come out to her house—but to collect money.

"Hudson Griffin, an employee of the Hornes, said that deceased always delivered bread early in the morning before they 'opened up'; that if they needed more bread he would see deceased and tell him, or go to where he lived and leave word; that deceased would always deliver in the morning from his truck and at night (presumably when he came to collect) from his automobile; that he always came in his automobile to collect, generally once a week but sometimes he would go three weeks without collecting; that the Hornes owed him between seven and ten dollars on the day of the accident and that he (Griffin) was not on duty that day. The testimony of this witness that additional orders for bread were sometimes given is in direct conflict with the statement of his employer on this subject.

"Mrs. W. L. Pearce, a friend of claimant and a volunteer witness, appeared when depositions were last taken. She said that deceased told her just before the accident that he was on his way to the Hornes to deliver 'some items' and to collect a bill. The unusual circumstances under which this alleged conversation took place makes the testimony of this witness of doubtful value.

"Earl Forehand, Sales Supervisor of the employer, testified that deceased, 'unless he broke down,' should finish his route by three o'clock in the afternoon; that the last thing he had to do each day was to fill 'out his bread orders' which were in the nature of requisitions to inform the driver of the supply truck the quantity of bread needed for the next day's delivery; that he had no duties after that; that on the day of his death deceased had filled out his bread orders and that they were subsequently picked up by the driver of the supply truck.

"Manifestly, the cardinal fact to be determined is the purpose or purposes of the unfinished trip to Zuni and Ivor.

"According to the testimony deceased gave several ex-

planations for the trip. He told his wife that he had to 'service' Goodman Horne at Ivor and collect from him— also that he was going to collect at Zuni—and that he was going to try at these places to 'work off' some cakes he had on hand; he tolds Mrs. Warren that he had to go to Zuni to deliver some bread; he told Frank Brown 'he had to run up to Ivor'; he told Mrs. Pearce he had to 'deliver some items'; and collect a bill from the Hornes. But he could not have intended to deliver any bread to anybody as there was none in his car. Nor could he have intended to collect at Zuni as he always collected from Ray Rainey, who ran a store there, on Mondays and never on any other day. And surely if deceased had had any business that night with his customer M. T. Manning at Zuni, Mr. Manning's testimony would have been secured. Insofar as the alleged purpose of 'working off' cakes is concerned it is difficult to believe that deceased would have made a special trip at the end of a day's work to get rid of a box of cakes. There is no evidence that he had any orders for bread or cakes, and he could have turned in the next day those left over just as his successor was accustomed to do with left over goods.

"A careful analysis of the evidence leads to the conclusion that deceased when he was killed was probably on his way to Goodman Horne's at Ivor. Although he had to pass through Zuni to reach Ivor, the record entirely fails to support the theory. that he intended to transact any business at Zuni. But certainly he was not going to the Hornes to deliver bread and cakes as he had made his deliveries early that morning and he had received no extra order. It may be that he intended to collect, but was that his principal purpose? It tests one's credulity to believe that after he had had his supper and put away his truck at the end of his day's work, deceased would have made a special trip of eleven miles after dark—it is dark at 6:30 P. M. at that time of the year—in his own car (contrary to instructions), and at his own expense, for the sole purpose of making a collection of a few dollars from a single customer. Further-

more from the testimony of Ray Rainey and claimant, the latter stating that deceased had not made his 'deposit on Monday' (which probably accounts for the contents of the money pouch at the time of the accident), his regular collection time undoubtedly was on Monday afternoon. This also was the case with his successor, Emerson Presson. But there was no regular time for collecting from the Hornes, and collections there were never made in the afternoons but always in the late evening or at night. Why was this? Why collect from Ray Rainey regularly on Monday afternoons and not go five miles further on the same road to the Hornes at Ivor? Obviously the special trip to the Hornes *for the purpose of collecting* was unnecessary. It is true that deliveries to the Hornes were made before opening time in the morning but this was also the case at Raineys. The reason for this special trip is to be found in the testimony of Mrs. Goodman Horne.

"As a corroborating witness for claimant Mrs. Horne rather overreached herself. For example, she was positive that during the entire period of more than three years that deceased had been on the route he had always come at night to collect—and in *his own personal car*. And yet deceased had only owned a car for eight months prior to his death. But beyond question the status of the Hornes was quite different from that of the other customers on the route. They were old friends of the Butlers—collections were made on irregular special night trips, sometimes as late as ten o'clock—at times there would be several weeks between collections—Mrs. Butler would frequently make these trips with deceased—they would sometimes have sandwiches together—occasionally they would come to the house instead of the store—deceased would generally bring along some bread or cakes and supply her (this probably accounts for the cakes in the car) if she had 'run short'. It is quite clear that the purpose of the night trips to the Hornes were more of a personal than a business nature.

"From a consideration of the entire record the inference is drawn, and a finding so made, that deceased died as the

result of an accident happening while he was on his way to Ivor, Virginia, for the principal purpose of a social visit with his friends, Mr. & Mrs. Goodman Horne, at that place, and with the incidental purpose of collecting from them for deliveries of bakery products previously made.

"The evidence does not support the defense that claimant had voluntarily deserted or abandoned deceased at the time of the accident. Although the two were not living together they appeared to be on reasonably friendly terms and occasionally spent week-ends together. One might gain the impression from some of the testimony that the lives of deceased and claimant before they separated were somewhat tempestuous, but there is no evidence from which an inference that she deserted him may be drawn.

"Nor does the evidence sustain the defense that deceased was guilty of wilful misconduct. He was driving his own car at the time of the accident and it is true that several years before the accident—at a time when he did not own a car—deceased had been instructed not to use his personal car for business purposes. But the fatal trip was not undertaken primarily for business reasons. Therefore, it was proper that he should be driving his car. However, even assuming that the trip was a business one, the defense of wilful misconduct must be overruled. The rule against the use of a personal car does not appear to have been a safety rule, nor is there anything in the record to show that the use of the car was the cause of the accident. The fact that the trip was made at night certainly made it more hazardous and thus may well have contributed to the accident, but the type of car used cannot be said from the record to have been a causative factor."

The foregoing findings of fact were reviewed before the full Commission on December 6, 1948, and were affirmed and adopted as the findings of the full Commission on December 15, 1948, and on the same day an order was entered dismissing the appellant's claim for compensation.

It is insisted by the appellant that the finding of fact that the decedent, at the time of the accident, "was on his

way to Ivor, Virginia, for the principal purpose of a social visit with his friends, Mr. and Mrs. Goodman Horne, at that place, and with the incidental purpose of collecting from them for deliveries of bakery products previously made," is without evidence to support it. However, under the circumstances of this case, we think the burden rested upon the claimant, appellant, to adduce adequate evidence to prove her contention that the decedent's death arose out of and in the course of his employment. The effect of this finding of fact by the Commission is that the evidence is not sufficient to support a conclusion that the decedent was engaged principally in the performance of the duties of his employment when the accident happened.

In *Sullivan* v. *Suffolk Peanut Co.*, 171 Va. 439, 199 S. E. 504, 120 A. L. R. 677, in an opinion by Mr. Justice Gregory, the following was said:

"The burden of supplying evidence from which the inference can be legitimately drawn that the injury arose out of and in the course of the employment, rests upon the claimant. An award based upon surmise or conjecture will be set aside. A finding that the injury is compensable, however, may be established by circumstantial evidence and in some cases claims are presumed to be within the meaning of the statute. 28 R. C. L., page 812."

It is true that in that case the employee, a night watchman, was found dead at a railroad crossing off of his employer's premises, but there was evidence showing that he was killed during his regular working hours, and that it was customary for him to perform his duties from that position because it afforded a better view of the premises than any other location. We held that, under such facts, "the court will indulge the presumption that the relation of master and servant existed at the time of the accident, and that it arose out of and in the course of his employment."

We do not think, however, that a like presumption would be applicable in the case at bar. At the time of the accident, the decedent was driving his own automobile contrary to the instructions of his employer' if he was actually

on the employer's business. He had apparently finished his day's work and delivered the business truck to the garage for servicing and storage overnight. There is no evidence that he had received any request from any of his customers to make any additional delivery of supplies, or that either Mrs. Horne or Mr. Griffin, her employee, were expecting him to call on the night in question. It appears from the testimony of Mrs. Horne that the decedent was very friendly with her and her husband, and often visited them socially at night—sometimes accompanied by his wife. In the light of these facts, no presumption can be said to arise that the relation of master and servant existed at the time of the accident, which was outside the decedent's regular working hours.

The appellant contends that her testimony, and that of her witnesses, as to the declarations claimed to have been made by the decedent with respect to his intended trips to Zuni and Ivor, should compel a finding of fact by the Commission that his principal, if not only, purpose in going to these towns was in order to transact his employer's business.

The purpose of the decedent's travel at the time of the accident is purely a question of fact. The appellant's contention is supported solely by hearsay testimony of statements said to have been made by the decedent, which it is impossible to contradict. The hearing Commissioner saw and observed the witnesses, and their demeanor, and had the opportunity to determine the weight and credibility of their testimony. We have repeatedly held that, under the provisions of the Workmen's Compensation Act, this court is bound by a finding of fact of the Industrial Commission, unless such finding is without substantial evidence to support it. *American Furniture Co.* v. *Graves,* 141 Va. 1, 126 S. E. 213; *Scott County School Board* v. *Carter,* 156 Va. 815, 159 S. E. 115; *Blair* v. *Buchanan Coal Corp.,* 171 Va. 102, 198 S. E. 491; *Brown* v. *Fox, ante,* p. 509, 54 S. E. (2d) 109; *Johnson* v. *Capitol Hotel, Inc., ante,* p. 585, 54 S. E. (2d) 106.

We conclude that the testimony referred to and dis-

cussed in the opinion of the Commission, *supra,* must be held ample to support this finding of fact.

We come now to the consideration of the question whether the fact found by the Commission that, although the principal purpose of the decedent in going to Ivor was for a social visit with his friends, it was also accompanied by the incidental purpose of collecting from them for deliveries of bakery products previously made, requires a conclusion of law that the accident arose out of and in the course of his employment. This question was maturely considered and ably discussed in the following excerpt from the opinion of Commissioner Martin, and, since we concur therein, we adopt it as the expression of our views:

"The finding that the primary purpose of the trip on which he was killed was personal and the business merely incidental compels the conclusion that the accident did not arise out of and in the course of the employment of deceased. The principles applicable to such a finding are admirably stated by former Justice Cardozo of the United States Supreme Court when he was Chief Justice of the Court of Appeals of New York. In *Marks' Dependents* v. *Gray,* 251 N. Y. 90, 167 N. E. 181, a case involving a highway accident where, as here, the issue turned on the necessity of the employee's trip, in reversing an award of the State Industrial Board of New York the distinguished jurist had this to say:

" 'The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. *Clawson* v. *Pierce-Arrow Motor Car Co.,* 231 N. Y. 273, 131 N. E. 914. If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk.

" 'Applying this test, we hold that Marks was not placed

upon the highway by force of any duty owing to his employer, and that the risk of travel was his own.'

"Applying the same test, deceased was not placed upon the highway by force of any duty to his employer and so the risk of travel was his own. His work did not create the necessity for this trip to Ivor. He had his regular day for collecting—Monday—and he could have collected from the Hornes then just as he did from Rainey. He voluntarily chose not to do this but for personal reasons three days later he made this special trip, not contemplated by his employer, and thus unnecessarily exposed himself to the hazards of the highway at night. In the light of this record could it be reasonably held that, if deceased had been compensated at so much for each hour of work, he would be entitled to be paid for this trip? We think not. If the deceased had not desired to visit with his friends he would not have made this trip. The irregularity of the trips, the lack of necessity for them, the time of making them, the relations between the parties, all point to the conclusion that collecting was a mere incident. Other cases in which the purpose of the travel was primarily personal and only incidentally for business are *Ridout* v. *Rose's 5-10-25c Stores*, 205 N. C. 423, 171 S. E. 642; *Boyer Chemical Laboratory Co.* v. *Industrial Comm.*, 366 Ill. 635, 10 N. E. (2d) 389, 113 A. L. R. 264."

See also, *Bradshaw* v. *Aronovitch*, 170 Va. 329, 196 S. E. 684.

We find no error in the order of the Commission and it must be affirmed.

*Affirmed.*